**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br>vs.<br><br>KRISTER SVEN EVERTSON,<br><br>        Defendant. | A05-063 CR (JWS)<br><br>**RECOMMENDATION<br>REGARDING<br>MOTION TO SUPPRESS<br>STATEMENTS**<br><br>(Docket No. 18) |

        Defendant **Krister Evertson** moves to suppress statements taken from him by law enforcement officers on May 26, 2004 as involuntary, and taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966) and Dickerson v. United States, 530 U.S. 428 (2000). Docket No. 18. The motion is opposed by the government. Docket No. 28. An evidentiary hearing on the motion was conducted on November 2, 2005. *See* Transcript of Evidentiary Hearing, Docket No. 39. Upon due consideration of the evidence and arguments of counsel **the magistrate judge**

**recommends that the motion to suppress statements be DENIED and the court adopt findings of fact and conclusions of law as stated below.**

### Factual Findings from Evidentiary Hearing

Defendant Krister Evertson was arrested pursuant to an arrest warrant on May 26, 2004 by members of the S.W.A.T. team. SA Derek D. Espeland, FBI, arrived at the scene and spoke with officers. At that time Evertson was in handcuffs in the back seat of an Alaska State Trooper patrol vehicle. TR. 40. SA Brady Ipock, FBI, was also present. After a few minutes Evertson was taken from the patrol vehicle and agents Espeland and Ipock spoke to Mr. Evertson. About five to eight law enforcement officers were nearby. SA Espeland identified himself to Evertson as a law enforcement officer. Both agents were dressed in street clothes, and carried concealed weapons. TR. 79. SA Espeland displayed his credentials to Evertson. Evertson seemed very talkative and curious about what was going on.

The agents briefly explained to Evertson that he was being arrested for shipping sodium metals in an improper fashion and that they had a search warrant for his house. TR. 44.

About 11:45 a.m. Evertson's handcuffs were moved to his front and SA Espeland read and explained to Evertson the <u>Miranda</u> rights that were stated on a FD-395 Form. SA Espeland advised Evertson of his <u>Miranda</u> rights using Form FD-395. Evertson was advised of his right to remain silent, his right to have an attorney,

that if he can not afford one that one can be appointed for him and that he could stop the questioning at any time by invoking his right to silence. The advisement warned that any statements made could be used against him in a court of law. TR. 102. Evertson had no questions about his rights and signed a waiver of rights form. During the advisement of rights Evertson's demeanor was cooperative and inquisitive.

In addition to reading the Form SA Espeland advised Evertson that he could choose to talk to the agents or not talk to them - it was his decision. TR. 103. SA Espeland also explained the rights as he read them. He explained that the right to remain silent meant that he did not have to talk to the agents. Evertson did not have any questions about his rights or whether he should talk to the agents. SA Espeland did not recall Evertson asking any questions about his rights. SA Espeland testified that it was clear to him that Evertson understood his rights, waived them and freely agreed to talk to the agents. TR. 112.

Initially the agents did not intend to advise Evertson of his rights at the scene but Evertson was very talkative so they proceeded to advise him of his rights. TR. 78. The rights were read verbatim to Evertson and then Evertson was allowed to read them to himself and to ask any questions.

Evertson asked no questions about his rights. He was advised that he had the right to remain silent, that he had the right to an attorney, that he had the

right to choose to speak to the officers and that he could stop the interrogation at any time. Evertson signed the waiver form and then SA Ipock signed it. The agents then asked Evertson some general questions about safety hazards and whether there were any weapons in the house.

      SA Espeland took the signed FD-395 to his office and the form was given to a secretary and logged into the computer system. It was designated "1A No. 17." TR. 47. SA Espeland was later unable to retrieve the form from his computer or to find the original document in his office although he spent hours looking for the form.

      Evertson was transported to the Wasilla Police Department in SA Espeland's vehicle, a Chevrolet Tahoe (not a marked police vehicle). The agents waited until arriving at the Police Department before starting their interrogation of Evertson. SA Espeland characterized the casual conversation en route to the police station as "chatty." TR. 49. The conversation was about chemicals and chemical processes involving sodium and borax. At the police station Evertson was taken to an office space rather than to an interview room. The agents offered Evertson water and a chance to use the restroom if needed. The two agents then began their interview.

      They explained to Evertson the arrest warrant and their concerns in wanting to talk with him. During the interview SA Espeland received calls from SA

Seale from the search scene. SA Seale called and asked if the interviewing agents would ask Evertson to provide a consent for the officers to go into his vehicle in front of the residence. SA Espeland drafted an ad hoc consent form and then explained to Evertson that he could sign the form but he did not have to do so. The agent explained that if he signed the form he was providing consent to the search. TR. 51. Evertson signed the consent form allowing SA Seale to search the vehicle(s) about 12:25 p.m. TR. 70. SA Espeland characterized Evertson's demeanor during this process as relaxed and "warmed up" to the agents. At one point during the interview Evertson told the agents that they were the nicest police officers he had ever met. TR. 52-53.

SA Ipock assisted in the interview of Evertson. Evertson made no complaints to the agents. SA Espeland took the lead in asking questions about chemicals and substances, and SA Ipock led the questioning relating to shipping and DOT regulations. The agents were very cordial and polite and there was never any hostility displayed during the interview. TR. 82. During one line of questioning Evertson was asked where the sodium metal came from and Evertson responded with words to the effect that if he told them, he'd probably get in more trouble. Evertson declined to answer questions about how he got the portion of the sodium from Idaho to Alaska. TR. 83. Evertson never provided that information during his interview. TR. 53.

During the interview Evertson's handcuffs were removed. The interview lasted less than two hours. TR. 85. Evertson never appeared upset during the interview. TR. 70. Because Evertson spoke with a stutter the agents asked him if he was under the influence of any substance such as alcohol, narcotics or medication. Evertson emphatically replied "no." The agents had no difficulty in understanding Evertson. Evertson told the agents that he was "healthy as a horse other than [his stutter]." TR. 85. He told the agents that he was taking Glucosamine for his joints, but inferred that he was not taking any other medication. TR. 85. The agents found Evertson to be rather intelligent and knowledgeable about how chemicals interact with one another.

There is no evidence that Evertson ever indicated that he did not want to speak with the agents or that he desired for the interview to cease. Evertson was never placed in isolation or threatened as an inducement to talk with the agents. At no time did Evertson make any statement that he wanted to consult with an attorney before speaking with the agents.

After agents Ipock and Espeland had completed their questioning they took Evertson back to his residence at Eureka Circle where investigators were still present. Evertson identified some of the chemicals that were in his garage. There, Evertson talked about sodium metal and his experiments. The agents talked about what the investigation involved. A form was drafted for the consent to seize

chemicals located in the garage.  The consent form allowing Special Agents to seize the chemicals was signed by Evertson about 3:15 p.m.  TR. 71.  After Evertson agreed to allow the agents to seize chemicals listed on an exhibit form the officers had no further questions for Evertson and he was transported to the Anchorage jail.  It took about an hour for that trip and the officers stopped en route to provide Evertson with a sandwich and something to drink.  TR. 58.

SA Espeland's interview notes prepared at the Wasilla Police Station make no reference to a <u>Miranda</u> warning being given to Evertson.  TR. 66.  However, SA Espeland's notes covered the period at the Wasilla Police Department which was after the advisement of rights at the scene.  The interview was not tape recorded.

The officers found a lot of "fairly dangerous chemicals" in the garage.  The hazardous material team wanted to seize those items for the sake of safety.  Evertson signed a consent allowing the items to be taken.[1]  Evertson seemed to have no hesitation in signing the consent.  TR. 84.

### Conclusions of Law

Evertson was in custody on May 26, 2004 when he made statements to FBI agents which he now seeks to suppress.  In order for inculpatory statements

---

[1] The prosecutor stated at the evidentiary hearing that the government would not offer evidence relating to the seizure of the additional items in the garage.  TR. 90.

made by a defendant during custodial interrogation to be admissible in evidence, the defendant's "waiver of Miranda rights must be voluntary, knowing, and intelligent." United States v. Binder, 769 F.2d 595, 599 (9th Cir. 1985).  *See* also Miranda, 384 U.S. at 479.  A valid waiver of Miranda rights depends upon the "totality of the circumstances including the background, experience, and conduct of defendant." United States v. Bernard S., 795 F.2d 749, 751 (9th Cir. 1986).

The government bears the burden of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his Miranda rights. *See* Colorado v. Connelly, 479 U.S. 157, 168 (1986).  There is a presumption against waiver.  North Carolina v. Butler, 441 U.S. 369, 373 (1979).

At the suppression hearing the government introduced sufficient evidence to establish that under the "totality of the circumstances," Evertson was aware of the "nature of the right being abandoned and the consequences of the decision to abandon it."  *See* Moran v. Burbine, 475 U.S. 412, 421 (1986).  I am satisfied from the evidence that Everston was aware of the nature of the constitutional rights he was abandoning and that he understood SA Espeland's recitation of his rights.  In addition, Evertson was given the opportunity to read the rights for himself and to ask any questions.  I conclude that the prosecution has met its burden of proving that Everston knowingly and intelligently waived his Miranda

rights. He was adequately informed of his rights and given the freedom of choice whether to speak to the agents or not.

Evertson argues that the government has fallen short of its burden of proof because the recitation of the rights and waiver were not tape recorded or memorialized in SA Espeland's report. There is no legal requirement under federal law that the colloquy be tape recorded by federal officers and the defendant has cited no case authority to that effect. It is clear under the evidence that the agent advised Evertson of his rights even though he did not address that colloquy in his report. SA Ipock was present and corroborated the testimony of SA Espeland regarding the advisement of rights. I find from the evidence that Evertson intended to relinquish his rights and voluntarily agreed to answer some but not all of the agents' questions. There was no equivocation in his response to the solicitation of a waiver. The government need not show that Evertson appreciated the consequences of waiving his Miranda rights.

I find no evidence of psychological or physical coercion surrounding his statements. He was offered water and the opportunity for a bathroom break and the conversation was conducted in a normal tone of voice. The defendant's intelligence and demeanor support the conclusion that the defendant made a conscious decision to voluntarily participate in the interview following the advisement and waiver of

Miranda rights. The agents were not required to re-advise him of the Miranda rights after transporting him to the Wasilla Police Department.

The evidence does not support the defendant's claim that Evertson's will to resist being interviewed by the agents was overcome as a result of a police dominated atmosphere. Evertson was essentially interrogated by two agents, Espeland and Ipock. The presence of other police officers at the scene did not render Evertson's statements involuntary or constrain Evertson's choice in deciding whether to talk with the agents. The language and procedure used by the agents to elicit Evertson's statements did not violate the Due Process test for evaluating voluntariness discussed in Dickerson v. United States, supra. That test provides for evaluating voluntariness of a defendant's confession by taking into consideration all the surrounding circumstances including the characteristics of the accused and the details of the interrogation.

Accordingly, the **Motion to Suppress Statements** should be **DENIED**. IT IS SO RECOMMENDED. The clerk shall give telephonic notice regarding entry of this Report and Recommendation.

DATED this   29th   day of December, 2005, at Anchorage, Alaska.

　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　JOHN D. ROBERTS
　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court **which will be forwarded directly to the Hon. John W. Sedwick** no later than **4:00 p.m. Wednesday, January 4, 2006**. **Responses** to any filed objections **need not be filed.** Objections shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).